United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 7, 2002 June 14, 2002 

 No. 01-5231

 Tax Analysts, 
 Appellant

 v.

 Internal Revenue Service, 
 Appellee

 Consolidated with 
 No. 01-5232

 ---------

 Appeals from the United States District Court 
 for the District of Columbia 
 (No. 96cv02285)

 William A. Dobrovir argued the cause for appellant/cross-
appellee. With him on the briefs was Cornish F. Hitchcock.

 Jonathan S. Cohen, Attorney, United States Department of 
Justice, argued the cause for appellee/cross-appellant. With 
him on the briefs were Roscoe C. Howard, Jr., United States 

Attorney, and Karen D. Utiger, Attorney, United States 
Department of Justice.

 Before: Edwards, Henderson, and Garland, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Edwards.

 Edwards, Circuit Judge: Several cases over the last two 
decades have required this court to consider whether records 
and documents of the Internal Revenue Service ("IRS" or 
"the Service") are exempt from public disclosure under the 
Freedom of Information Act ("FOIA"), 5 U.S.C. s 552 (2000). 
In this case, the District Court determined that the IRS' 
Legal Memoranda ("LMs") and the Office of Chief Counsel's 
("OCC") intradivisional Technical Assistance memoranda 
("TAs") are exempt from disclosure pursuant to the delibera-
tive process privilege encompassed in FOIA Exemption 5, 5 
U.S.C. s 552(b)(5). The District Court further held that IRS 
need not segregate and release agency working law from TAs 
withheld pursuant to Exemption 5's attorney work product 
privilege. We affirm the District Court's judgment and adopt 
its reasoning and conclusions on these points.

 The District Court also ordered IRS to release eight TAs, 
finding the information not exempt from disclosure under 
FOIA Exemption 7(E), because the information did not con-
cern "investigations which focus directly on specifically al-
leged illegal acts, illegal acts of particular identified officials, 
acts which could, if proved, result in civil or criminal sanc-
tions." Tax Analysts v. IRS, 152 F. Supp. 2d 1, 14, Mem. 
Op., (D.D.C. Mar. 26, 2001) [hereinafter "Mem. Op. II"]. 
This was error. We therefore reverse and remand on this 
point so that the District Court may reassess this material 
pursuant to the correct legal standard.

 Finally, the District Court ruled that IRS properly with-
held five TAs issued to program managers pursuant to Ex-
emption 5's deliberative process privilege, but held that IRS 
must release five other such TAs. IRS appeals the latter 
determination as to three of the five documents that were 
ordered released. After reviewing the TAs in camera, we 

hold that the District Court correctly distinguished between 
TAs that are part of an internal give-and-take discussion and 
TAs that reflect OCC's considered legal conclusions. We 
therefore affirm the judgment of the District Court on these 
issues.

 I. Background

 Tax Analysts is a non-profit organization that publishes 
news and other material on taxation. In 1995, Tax Analysts 
made a FOIA request for several categories of unpublished 
IRS internal memoranda. In response, the Service released 
certain documents but withheld others. Tax Analysts 
brought an action in the District Court for the District of 
Columbia. Pursuant to intervening legislation and a partial 
settlement by the parties, most of the categories of memoran-
da were eventually released. The two categories still at issue 
are LMs and certain sub-categories of TAs.

 On the basis of a largely undisputed factual record, the 
District Court described LMs as follows:

 LMs are prepared by so-called "docket attorneys" in the 
 Office of Chief Counsel to assist in the preparation and 
 review of proposed revenue rulings. Revenue rulings 
 are official interpretations of the Internal Revenue Code 
 and other tax materials. Before a proposed revenue 
 ruling is published and achieves the status of precedent, 
 it must pass through a multi-faceted review process that 
 is not complete until the Office of the Assistant Secretary 
 (Tax Policy) at the Department of Treasury grants its 
 final approval. As a proposed revenue ruling works its 
 way through this process, it is accompanied by a "publi-
 cation package." Sometimes, but not always, the publi-
 cation package includes a LM. According to the Chief 
 Counsel Publications handbook, LMs may include a re-
 statement of the proposed revenue ruling's issue and 
 holding; justification, arguments, and lines of research 
 that are not reflected fully in the proposed revenue 
 ruling; and the principal arguments for reaching a con-
 trary position. The LM serves as briefing material for 
 
 the reviewers, providing a comprehensive summary of 
 the drafter's legal research as well as the drafter's 
 evaluation of the proposed ruling's strengths and weak-
 nesses. At various points in the approval process the 
 publication package may be returned to the drafter for 
 revisions. Once approved by Treasury, revenue rulings 
 are published in the Internal Revenue Bulletin for the 
 information and guidance of taxpayers. There is no 
 formal process, however, whereby the LM is conformed 
 to reflect the final published revenue ruling.
 
 After a proposed revenue ruling is definitively ap-
 proved or rejected, the publication package is archived 
 and can be retrieved by reference to the number of the 
 proposed revenue ruling. The accompanying LM, if any, 
 is archived with the rest of the publication package, but 
 there is no indexing or retrieval system by which one can 
 identify those files that contain an LM. IRS attorneys 
 sometimes keep copies of LMs for their own reference, 
 and may retrieve the revenue ruling file if they wish to 
 probe the history behind a certain revenue ruling. At-
 torneys may exchange LMs informally, but they are not 
 distributed through official channels.
 
Tax Analysts v. IRS, 97 F. Supp. 2d 13, 16, Mem. Op., 
(D.D.C. Mar. 31, 2000) [hereinafter "Mem. Op. I"] (internal 
citations omitted).

 As for TAs, the District Court offered the following de-
scription:

 TAs are prepared by the four technical divisions within 
 the Office of Associate Chief Counsel (Domestic): the 
 Office of Assistant Chief Counsel (Passthroughs & Spe-
 cial Industries), the Office of Assistant Chief Counsel 
 (Income Tax & Accounting), the Office of Assistant Chief 
 Counsel (Corporate), and the Office of Assistant Chief 
 Counsel (Financial Institutions & Products). These tech-
 nical divisions prepare TAs in response to requests from 
 many different offices for many different purposes. The 
 IRS has attempted to categorize the TAs by requester. 
 One such category, TAs to the district or regional offices 
 
 of the IRS or Office of Chief Counsel, or Service Centers 
 ("the field") were dismissed from the case in the context 
 of the IRS's motion to dismiss. Four categories remain: 
 TAs to program managers in the national office, TAs to 
 component offices of the national Office of Chief Counsel 
 (intra-national office TAs), TAs to specific taxpayers, and 
 TAs to federal and state government agencies. Within 
 each of these four categories, the TAs can be further 
 categorized by their purpose. For example, TAs to 
 program managers fall into eight different categories, 
 and intra-national office TAs fall into four different cate-
 gories.
 
Id. at 20 (internal citations omitted).

 The District Court reviewed sample documents in camera, 
along with a Vaughn index prepared by IRS. Both parties 
moved for summary judgment. The court granted IRS' 
motion as to LMs, which IRS had claimed were exempt under 
FOIA Exemption 5's deliberative process privilege. Id. at 16-
18. The District Court held that the withheld portions of 
LMs did not constitute IRS working law and were therefore 
exempt under the privilege. Id. The District Court rea-
soned that, like the Background Information Notes in Arthur 
Andersen & Co. v. IRS, 679 F.2d 254 (D.C. Cir. 1982), LMs 
were written by lower-level attorneys for use by senior 
decisionmakers. Id. at 16-17. The District Court found that 
LMs are not officially approved by the senior decisionmakers 
and do not "emanate from [OCC] with any appearance of 
authority." Id. at 17.

 The District Court distinguished LMs from the General 
Counsel's Memoranda at issue in Taxation With Representa-
tion Fund v. IRS, 646 F.2d 666, 670 (D.C. Cir. 1981) [herein-
after "TWRF"], which were used to promote uniformity in 
IRS policy. Mem. Op. I at 17. The court found that, unlike 
General Counsel's Memoranda, LMs are not updated to re-
flect the national office's current position, widely distributed 
within IRS, or officially reconciled to reflect uniform policy. 
Id. The District Court also distinguished LMs from the 
Field Service Advice memoranda ("FSAs") at issue in Tax 

Analysts v. IRS, 117 F.3d 607 (D.C. Cir. 1997), because LMs 
flow "upward" from staffers to reviewers, while FSAs flow 
"outward" from OCC to field personnel. Id. (citing Tax 
Analysts, 117 F.3d at 617). Thus, the District Court upheld 
IRS' policy of redacting the portions of LMs reflecting the 
authors' opinions and analysis. Id. at 17-18.

 With regard to TAs, the District Court ordered further 
briefing. Id. at 21-23. The court then rejected Tax Analysts' 
argument that IRS was required to demonstrate that it had 
complied with the so-called "harm rule," a policy set forth in 
the Internal Revenue Manual ("Manual"). Id. at 15 n.3. The 
"harm rule" stated that IRS would grant FOIA requests 
unless the record is exempt and disclosure would significantly 
impede IRS actions in carrying out a responsibility or func-
tion. Id. The District Court found that the rule is non-
binding. Id. Tax Analysts moved for reconsideration of this 
ruling. In Mem. Op. II, the District Court denied Tax 
Analysts' motion as untimely. The District Court also revisit-
ed the merits and found that the Manual's harm rule, which 
had been revised, was still not binding because it lacked 
mandatory language and did not demonstrate that IRS in-
tended to be bound by the policy. Id. at 7-8.

 The District Court then turned to TAs. With respect to 
TAs withheld pursuant to FOIA Exemption 7(E), the court 
held that eight of the TAs were not exempt because they did 
not focus on "a specifically alleged illegal act of any particular 
identified case or individual," and therefore were not compiled 
for law enforcement purposes as the exemption requires. Id. 
at 15. With respect to TAs withheld in their entirety pursu-
ant to the attorney work product privilege encompassed by 
Exemption 5, the court held that IRS was not required to 
segregate and release the portions of the TAs that constituted 
agency working law. Id. at 18-19.

 With respect to TAs withheld pursuant to Exemption 5's 
deliberative process privilege, the District Court made two 
rulings that Tax Analysts now appeals. First, the court 
addressed certain TAs to program managers. These TAs 
contain OCC's answers to questions submitted by program 

managers in IRS' national office, sometimes concerning indi-
vidual taxpayers. The District Court ordered IRS to release 
five of these TAs and rejected the request for disclosure of 
another five. Id. at 22-24. The court found that the five TAs 
that were held subject to disclosure are treated as final 
documents that represent the considered position of OCC, 
while those held to be exempt are merely part of a delibera-
tive process involving OCC and IRS' program managers. Id. 
at 22-23. The court likened the TAs it ordered released to 
the FSAs at issue in Tax Analysts. Id. at 22.

 Second, the District Court addressed intra-divisional TAs, 
which are issued when one component of OCC advises anoth-
er component that has been assigned to create a private letter 
ruling or other official document. Id. at 24. The District 
Court found that these TAs are "predecisional and delibera-
tive," because they are solicited from a component of the 
agency that lacks the authority to issue a final legal decision. 
Id. at 24. The content of these TAs is "subject to modifica-
tion or rejection prior to the finalization into the final work 
product." Id. The District Court thus found that these TAs 
are exempt from disclosure under the deliberative process 
privilege. Id. at 25.

 Both parties moved for reconsideration. In Tax Analysts 
v. IRS, 152 F. Supp. 2d 1, 27, Mem. Op. (Motion for Reconsid-
eration), (D.D.C. May 21, 2001) [hereinafter "Mem. Op. III"], 
the District Court denied both parties' motions in relevant 
part. The court rejected Tax Analysts' argument that TAs 
withheld pursuant to the attorney work product privilege 
should not be protected in their entirety. Id. at 29. The 
court also restated its holding that TAs not focusing on an 
individual investigation were not records compiled for law 
enforcement purposes as required by Exemption 7(E). Id. at 
30-31.

 II. Discussion

A. LMs, Intra-divisional TAs, the Attorney Work Product 
 Privilege, and the IRS Manual

 FOIA Exemption 5 protects "inter-agency or intra-agency 
memorandums or letters which would not be available by law 

to a party other than an agency in litigation with the agency." 
5 U.S.C. s 552(b)(5). The exemption allows an agency to 
withhold those materials that would be privileged from dis-
covery in civil litigation. NLRB v. Sears, Roebuck & Co., 421 
U.S. 132, 149 (1975). As such, it is interpreted to encompass, 
inter alia, three evidentiary privileges: the deliberative pro-
cess privilege, the attorney-client privilege, and the attorney 
work product privilege. Burka v. HHS, 87 F.3d 508, 516 
(D.C. Cir. 1996).

 The District Court correctly found that LMs and intra-
divisional TAs do not constitute agency working law and are 
exempt pursuant to the deliberative process privilege. The 
District Court also correctly determined that the harm rule 
articulated in the Manual does not bind IRS or create rights 
in Tax Analysts. Finally, the District Court correctly deter-
mined that IRS need not segregate and release agency 
working law from TAs withheld in their entirety pursuant to 
the attorney work product privilege. Because the District 
Court's analysis and conclusions on these points are eminent-
ly sound, no further elaboration is necessary. We therefore 
affirm the District Court's judgment on these issues and 
adopt its reasoning and conclusions.

B. Exemption 7(E)

 The Service withheld portions of 16 TAs pursuant to Ex-
emption 7(E). This exemption allows an agency to withhold:

 records or information compiled for law enforcement 
 purposes, but only to the extent that the production of 
 such law enforcement records or information ... (E) 
 would disclose techniques and procedures for law en-
 forcement investigations or prosecutions, or would dis-
 close guidelines for law enforcement investigations or 
 prosecutions if such disclosure could reasonably be ex-
 pected to risk circumvention of the law.... 
 
5 U.S.C. s 552(b)(7). The dispute in this case turns on 
whether IRS has shown that the disputed records or informa-
tion were compiled for "law enforcement purposes."

 There are several overarching principles that the courts 
follow in assessing whether records or information satisfy the 
threshold requirement of s 552(b)(7). First, "law enforce-
ment purposes" under Exemption 7 includes both civil and 
criminal matters within its scope. Pratt v. Webster, 673 F.2d 
408, 420 n.32 (D.C. Cir. 1982). Second, the FOIA makes no 
distinction between agencies whose principal function is crimi-
nal law enforcement and agencies with both law enforcement 
and administrative functions. Id. at 416. Therefore, agen-
cies like IRS, that combine administrative and law enforce-
ment functions, as well as agencies like the Federal Bureau of 
Investigation ("FBI"), whose principal function is criminal law 
enforcement, may seek to avoid disclosure of records or 
information pursuant to Exemption 7. Finally, "courts can 
usually assume that government agencies act within the scope 
of their legislated authority." Id. at 418. However, courts 
apply a more deferential standard to a claim that information 
was compiled for law enforcement purposes when the claim is 
made by an agency whose primary function involves law 
enforcement. Id. This point was amplified in Pratt v. Web-
ster:

 On the one hand, the assumption that a mixed-function 
 agency is acting within the scope of its authority tells a 
 court nothing about whether it has met the Exemption 7 
 threshold requirement of a "law enforcement purpose." 
 Law enforcement, indeed, is often one of such an agen-
 cy's proper functions, but other functions are also a 
 major part of the agency's day-to-day business. Thus, a 
 court must scrutinize with some skepticism the particular 
 purpose claimed for disputed documents redacted under 
 FOIA Exemption 7.... If courts accept a mixed-
 function agency's claims of "law enforcement purpose" 
 without thoughtful consideration, the excessive withhold-
 ing of agency records which Congress denounced and 
 sought to avoid ... might well result.
 
 On the other hand, the generally accurate assumption 
 that federal agencies act within their legislated purposes 
 implies that an agency whose principal mission is crimi-
 nal law enforcement will more often than not satisfy the 
 
 Exemption 7 threshold criterion. Thus, a court can 
 accept less exacting proof from such an agency that the 
 purpose underlying disputed documents is law enforce-
 ment. This less exacting judicial scrutiny of a criminal 
 law enforcement agency's purpose in the context of the 
 FOIA Exemption 7 threshold is further bolstered by 
 Congress' concern that inadvertent disclosure of criminal 
 investigations, information sources, or enforcement tech-
 niques might cause serious harm to the legitimate inter-
 ests of law enforcement agencies.
 
Id. (internal citations and footnotes omitted).

 In the instant case, the District Court correctly identified 
IRS as a mixed-function agency, subject to an exacting stan-
dard when it comes to the threshold requirement of Exemp-
tion 7. The District Court, however, relied on Rural Hous-
ing Alliance v. United States Department of Agriculture, 498 
F.2d 73, 81 (D.C. Cir. 1974), in holding that a mixed-function 
agency may only withhold information pursuant to Exemption 
7 when the information concerns "investigations which focus 
directly on specifically alleged illegal acts, illegal acts of 
particular identified officials, acts which could, if proved, 
result in civil or criminal sanctions." Mem. Op. II at 14 
(quoting). This was error.

 Rural Housing and its progeny apply only when an agency 
seeks to invoke Exemption 7 in a situation in which there is 
an ongoing law enforcement "investigation." The court re-
cently explained the development of this line of authority in 
Jefferson v. Department of Justice, 284 F.3d 172 (D.C. Cir. 
2002):

 In assessing whether records are compiled for law 
 enforcement purposes, this circuit has long emphasized 
 that the focus is on how and under what circumstances 
 the requested files were compiled, ... and "whether the 
 files sought relate to anything that can fairly be charac-
 terized as an enforcement proceeding." ... In Rural 
 Housing Alliance v. Dep't of Agriculture, 498 F.2d 73 
 (D.C. Cir. 1974), the court identified two types of investi-
 gatory files that government agencies compile: (1) files 
 
 in connection with government oversight of the perfor-
 mance of duties by its employees, and (2) files in connec-
 tion with investigations that focus directly on specific 
 alleged illegal acts which could result in civil or criminal 
 sanctions. Id. at 81. Again, the court emphasized that 
 the purpose of the investigatory files "is the critical 
 factor." Id. at 82. Thus, if the investigation is for a 
 possible violation of law, then the inquiry is for law 
 enforcement purposes, as distinct from customary sur-
 veillance of the performance of duties by government 
 employees. Id. Then, in Pratt v. Webster, 673 F.2d 408 
 (D.C. Cir. 1982), the court set forth a two-part test 
 whereby the government can show that its records are 
 law enforcement records: the investigatory activity that 
 gave rise to the documents is "related to the enforcement 
 of federal laws," and there is a rational nexus between 
 the investigation at issue and the agency's law enforce-
 ment duties. Id. at 420, 421. The court again distin-
 guished the need "to establish that the agency acted 
 within its principal function of law enforcement, rather 
 than merely engaging in a general monitoring of private 
 individuals' activities." Id. at 420.
 
 The court applied these principles in Kimberlin v. 
 Dep't of Justice, 139 F.3d 944 (D.C. Cir. 1998). In that 
 case, the requester asked for "all papers, documents and 
 things pertaining to the OPR investigation" of another 
 AUSA. Id. at 947. Applying the distinction between law 
 enforcement records and internal agency investigations 
 set forth in Rural Housing, 498 F.2d at 81, the court 
 stated that "[m]aterial compiled in the course of ... 
 internal agency monitoring does not come within Exemp-
 tion 7(C) even though it 'might reveal evidence that later 
 could give rise to a law enforcement investigation.' " 
 Kimberlin, 139 F.3d at 947. Concluding, however, that 
 "the OPR investigation here at issue was conducted in 
 response to and focused upon a specific, potentially ille-
 gal release of information by a particular, identified 
 official," id. at 947, the court held that the information in 
 
 the OPR files was compiled for law enforcement pur-
 poses. Id.
 
Id. at 176-77.

 Appellant Tax Analysts argues that, under the Rural 
Housing test, the scope of Exemption 7 is limited to situa-
tions in which the agency can show that the disputed material 
relates to an investigation focusing directly on specific al-
leged illegal acts which could result in civil or criminal 
sanctions. We disagree. The Rural Housing standard is 
still good law, but it has no bearing on the issue in this case. 
The information here at issue does not relate to any ongoing 
"investigation" by IRS. Rather, IRS seeks to avoid disclo-
sure of internal agency material relating to guidelines, tech-
niques, and procedures for law enforcement investigations 
and prosecutions outside of the context of a specific investiga-
tion. Such materials clearly satisfy the "law enforcement 
purposes" threshold of Exemption 7. The District Court's 
holding to the contrary failed to take adequate account of 
1986 amendments to Exemption 7.

 Prior to 1986, Exemption 7 required a threshold showing 
that the materials in question were "investigatory records 
compiled for law enforcement purposes." 5 U.S.C. 
s 552(b)(7) (1982). However, in 1986, Congress amended the 
exemption to protect "records or information compiled for law 
enforcement purposes," deleting any requirement that the 
information be "investigatory." Anti-Drug Abuse Act of 
1986, s 1802(a), Pub. L. No. 99-570, 100 Stat. 3207, 3207-48 
(1986) (amending 5 U.S.C. s 552(b)(7)). See North v. Walsh, 
881 F.2d 1088, 1098 n.14 (D.C. Cir. 1989) (stating that the 
1986 amendment "changed the threshold requirement for 
withholding information under exemption 7: the exemption 
formerly covered 'investigatory records compiled for law en-
forcement purposes'; it now applies more broadly to 'records 
or information compiled for law enforcement purposes' "); 
Keys v. United States Dep't of Justice, 830 F.2d 337, 340 
(D.C. Cir. 1987) (same). And the legislative history makes it 
clear that Congress intended the amended exemption to 
protect both investigatory and non-investigatory materials, 

including law enforcement manuals and the like. See S. Rep. 
No. 98-221, at 23 (1983) (expressing intent to protect "sensi-
tive non-investigative law enforcement materials" and to 
broaden the exemption to include records "regardless of 
whether they may be investigatory or noninvestigatory"). 
Congress also amended Exemption 7(E) to permit withhold-
ing of "guidelines for law enforcement investigations or pros-
ecutions if such disclosure could reasonably be expected to 
risk circumvention of the law," thus giving further indication 
that the statutory threshold was not limited to records or 
information addressing only individual violations of the law. 
See 5 U.S.C. s 552(b)(7)(E) (emphasis added); S. Rep. No. 98-
221, at 24 (1983).

 It is clear that, under the amended threshold of Exemption 
7, an agency may seek to block the disclosure of internal 
agency materials relating to guidelines, techniques, sources, 
and procedures for law enforcement investigations and prose-
cutions, even when the materials have not been compiled in 
the course of a specific investigation. See, e.g., PHE, Inc. v. 
Dep't of Justice, 983 F.2d 248, 250-51 (D.C. Cir. 1993) (holding 
that portions of a FBI manual describing patterns of viola-
tions, investigative techniques, and sources of information 
available to investigators were protected by Exemption 7(E)). 
The amended threshold to Exemption 7 "resolve[s] any doubt 
that law enforcement manuals and other non-investigatory 
materials can be withheld under (b)(7) if they were compiled 
for law enforcement purposes and their disclosure would 
result in one of the six recognized harms to law enforcement 
interests set forth in the subparagraphs of the exemption." 
S. Rep. No. 98-221, at 23 (1983). Accordingly, we reverse and 
remand the District Court's judgment on this point.

 It will be up to the District Court in the first instance to 
apply the correct threshold and then to determine, as Exemp-
tion 7(E) requires, whether release of the disputed agency 
materials "would disclose techniques and procedures for law 
enforcement investigations or prosecutions, or would disclose 
guidelines for law enforcement investigations or prosecutions 
if such disclosure could reasonably be expected to risk cir-

cumvention of the law." The District Court may conclude 
that some or all of the disputed TAs must be released, but 
this conclusion cannot be based on the fact that they do not 
relate to the investigation of a particular act of wrongdoing.

C. TAs to Program Managers

 IRS appeals the District Court's decision with regard to 
three of the five TAs to program managers that the court 
ordered released. IRS argues that these three TAs should 
have been withheld pursuant to the deliberative process 
privilege of Exemption 5. IRS does not appeal the release of 
the other two TAs to program managers. Br. for Appel-
lee/Cross-Appellant at 57 n.5 (stating that IRS does not 
appeal the District Court's ruling with respect to TAs num-
bered TR-45-1383-93 and TR-45-1974-93). The three TAs on 
appeal are issued to program managers within the national 
office of IRS.

 The deliberative process privilege protects "confidential 
intra-agency advisory opinions ... disclosure of which would 
be injurious to the consultative functions of government." 
Sears, 421 U.S. at 149 (internal citations and quotation marks 
omitted). It encompasses "documents reflecting advisory 
opinions, recommendations, and deliberations comprising part 
of a process by which governmental decisions and policies are 
formulated, as well as other subjective documents that reflect 
the personal opinions of the writer prior to the agency's 
adoption of a policy." TWRF, 646 F.2d at 677 (citing Sears, 
421 U.S. at 150). It does not, however, apply to final state-
ments of agency policy or to statements that explain actions 
that an agency has taken. Id. In other words, it protects 
"predecisional communications" reflecting an agency's inter-
nal deliberations, but not communications that explain a 
decision that has already been made. Sears, 421 U.S. at 151-
52. In order to determine whether the District Court applied 
these principles correctly, we have reviewed the three disput-
ed TAs in camera, along with the five that the court ordered 
withheld and the two not appealed, for comparative purposes.

 The District Court grouped the five TAs it ordered re-
leased into two categories. First, the court ordered the IRS 

to release TAs that concerned specific taxpayers or classes of 
taxpayers. These included the following TAs: TR-45-2233-93 
(presenting OCC's legal analysis regarding a particular class 
of taxpayers engaged in specified activities); TR-45-1383-93 
(not appealed) (presenting OCC's legal analysis and computa-
tions regarding certain transactions of a particular taxpayer); 
TR-45-1974-93 (not appealed) (presenting OCC's legal analy-
sis and conclusion regarding how the program manager 
should apply a certain statutory provision to a particular 
taxpayer); and TR-45-2473-93 (presenting OCC's conclusion 
as to whether a particular taxpayer qualified for a specified 
exemption). Second, the District Court ordered the IRS to 
release a TA that addressed the interpretation of the internal 
revenue laws generally: TR-45-2820-92 (answering a question 
concerning whether taxpayers at large may use a particular 
procedure).

 The District Court correctly likened these five TAs to the 
FSAs at issue in Tax Analysts, 117 F.3d 607. Like FSAs, 
TAs are issued by OCC and sent to IRS personnel in 
response to official queries. FSAs were issued to field attor-
neys, revenue agents, and appeals officers, while TAs are 
issued to program managers. Tax Analysts, 117 F.3d at 609. 
FSAs usually dealt with particular taxpayers, as do four of 
the TAs in this case. Id. The TA concerning general 
procedures reflects OCC's considered position on a precise 
issue. FSAs and these TAs both contain legal analysis, 
conclusions, and advice. Id. It is therefore unsurprising 
that, as the District Court found, IRS conceded that taxpay-
er-specific TAs to program managers are all but identical to 
FSAs. Mem. Op. II at 22; Def. Statement of Genuine Issues 
in Opp. to Pl.'s Statement of Material Facts p 3.12 (stating 
that IRS did not object to Tax Analysts' statement that, in 
many cases, the only difference between FSAs and taxpayer-
specific TAs is the originating office), reprinted at Joint 
Appendix 383, 344.

 The five TAs that the District Court ordered withheld, 
while not before us on appeal, nevertheless provide a useful 
contrast and an illustration of the kinds of documents that 
truly reflect a debate among equally-positioned decisionmak-
ers. For example, in TR-955-93, OCC comments on a draft 

tax form and instructions for filling out another form. The 
TA uses markedly different language from that found in the 
TAs that the District Court ordered released, repeatedly 
prefacing comments with such phrases as "We believe" and 
"We suggest" and advising the recipient that the form 
"should" reflect a certain principle. Similarly, in TR-45-2164-
93, OCC proposed solutions to a potential legal problem. In 
TR-45-307-93, OCC commented on a legislative proposal, 
expressing legal "concern[s]" about some of its language. 
The tone of these TAs suggest that they were prepared 
merely to "discuss the wisdom or merits of a particular 
agency policy, or recommend new agency policy, raising the 
possibility that their disclosure would mislead the public." 
Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 
869 (D.C. Cir. 1980). By contrast, the TAs that the District 
Court ordered released use such language as "It is the 
position of the Treasury Department that ..." (TR-45-2233-
93) and "We conclude" (TR-45-2473-93). The tone of these 
TAs indicates that they "simply explain and apply established 
policy." Coastal States, 617 F.2d at 869.

 IRS argues that while the disputed TAs to program manag-
ers may be the final word of OCC, they are issued to program 
officers who make the final decisions about their programs. 
IRS characterizes the TAs as part of a dialogue among 
equals, rather than pronouncements from senior officials to 
junior field agents. These arguments are unpersuasive. It is 
not necessary that the TAs reflect the final programmatic 
decisions of the program officers who request them. It is 
enough that they represent OCC's final legal position con-
cerning the Internal Revenue Code, tax exemptions, and 
proper procedures. We reach this conclusion in reliance on 
the fact that the disputed TAs travel horizontally, from the 
OCC to program officers. By contrast, documents that rep-
resent the final legal position of the OCC and travel upward - 
for example, memoranda to the Commissioner of Internal 
Revenue advising him on legal issues - may still be part of 
the agency's deliberative process and thus fall within Exemp-
tion 5. See Coastal States, 617 F.2d at 868 (noting that "a 
document from a subordinate to a superior official is more 

likely to be predecisional," and that "this court recently 
identified as 'a classic case of the deliberative process at 
work' a series of memoranda to the Assistant Secretary of the 
Army from the General Counsel in his department, recom-
mending legal strategy in light of a particular controversy") 
(quoting Murphy v. Dep't of the Army, 613 F.2d 1151, 1154 
(1979)).

 Under the FOIA, "working law" must be disclosed whether 
or not those who use the working law make the final decisions 
about program implementation. See id. (holding that the 
disputed documents, "whatever the formal powers of [the 
issuing officials] to issue binding interpretations of the regula-
tions, in practice represent interpretations of established 
policy on which the agency relies in discharging its regulatory 
responsibilities" and that they must be disclosed). Thus, the 
District Court correctly ordered the disputed three TAs 
released.

 The distinction between deliberative TAs and TAs that 
represent the OCC's considered legal conclusions is not ame-
nable to a categorical formula. It can turn on the subject 
matter of the TA, on its recipient, on its place in the decision-
making process, and even on its tone. Nonetheless, after 
reviewing the ten TAs in camera, we are satisfied that the 
District Court committed no error in its judgment regarding 
these materials

 III. Conclusion

 For the foregoing reasons, we affirm in part, reverse in 
part, and remand the case to the District Court for further 
proceedings consistent with this opinion.